DORSETT v. ORMISTON et al.

(Supreme Court, Appellate Division, First Department. July 17, 1900.)

1. COMPROMISE AND SETTLEMENT—FRAUD AND DURESS—PARTNERSHIP.

Where a partner, who was well acquainted with the partnership business and was a lawyer of many years' experience, entered into a partnership settlement, and was represented by an eminent member of the bar, he cannot thereafter have the settlement set aside on the ground of fraud and duress.

2. SAME—EQUITY—LACHES.

Laches of two years after alleged duress and fraud in procuring a partnership settlement, during which time others have changed their position, relying on the settlement, will defeat a suit to set it aside.

3. COSTS—EXTRA ALLOWANCE.

Where, in a suit to set aside a partnership settlement, parties whose rights ought not to have been questioned were compelled to defend, which involved a large amount of preparation, and took many days to try, and the full extra allowance of costs permitted by law was not sufficient to meet their expenses in the suit, it was proper for the court to make an extra allowance.

Appeal from special term.

Suit by Robert Clarence Dorsett against Thomas S. Ormiston and others to set aside a partnership settlement, for an accounting, and to dissolve the partnership. Judgment for defendants (55 N. Y. Supp. 1037), and plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, McLAUGHLIN, PATTERSON, and INGRAHAM, JJ.

Edward C. James, for appellant.
John M. Bowers, for respondents.

INGRAHAM, J. The plaintiff and the defendant Ormiston were co-partners practicing law in the city of New York from January 1, 1883, to June 1, 1893. The firm was also engaged in the purchase and sale of real estate, and in making building loans on property that had been sold by the firm. To carry on this business, which required at times a considerable amount of ready money, the co-partnership had used moneys belonging to members of the McCormack family, one of whom was the wife of the defendant Ormiston. The assets of the firm consisted largely of real estate, the greater part of which seems to have been heavily mortgaged, and junior mortgages on property upon which building loans had been made. The firm was liable upon a note signed by both partners, held by the Corn Exchange Bank, for $70,000, and certain claims were made by members of the McCormack family for moneys or securities which had been used by the firm or one of its members. In the spring of 1895 some question was raised as to the financial condition of the firm, and it seems to have been realized that considerable money would be necessary to enable it to protect its property and to prevent great sacrifice of its assets. Under these circumstances, negotiations were commenced between the partners which resulted in the execution of an agreement dissolving the firm and transferring all of its assets to the defendant Ormiston, the assumption by Ormis-

ton of all the obligations of the firm, and the release of the plaintiff from all liability to the Corn Exchange Bank upon the note of the firm held by the bank, and from the members of the McCormack family. Included in this settlement was a provision by which certain of the firm securities which had been transferred to the plaintiff's wife and sister should be retransferred to the firm, and certain other property of the firm transferred to them in lieu thereof; and the necessary transfers, conveyances, and releases to carry this agreement into effect were executed. The firm property was thus vested in Ormiston, and the plaintiff withdrew from the firm, and was released from all liability for the firm's indebtedness. This agreement was dated May 31, 1895, and it and the conveyances and releases necessary to carry it into effect executed on the 1st and 3d of June, 1895, and the transaction seems to have been closed on June 3d. There is no allegation but that this agreement was fully performed. Ormiston settled with the firm's creditors, obtained releases from the McCormack family, and transferred to them certain of the firm property which he had received under the agreement, and satisfied the claim of the Corn Exchange Bank. Subsequently, and on June 3, 1897, this action was brought to set aside this agreement executed on June 3, 1895, on the ground that it was obtained by duress and fraud, asking for a dissolution of the firm, and an accounting by Ormiston and the other defendants of the firm property transferred under the agreement. The action was tried at special term, and resulted in a judgment for the defendants, from which the plaintiff appeals.

The size of this record makes it impossible, within the limits of a judicial opinion, to review the testimony. The question presented is one of fact, and the learned trial judge very satisfactorily reviewed the testimony and stated the reasons that led him to the conclusion that the plaintiff had failed to prove the facts which would justify the court in granting him any relief. I shall not attempt to do more than to present as tersely as possible the situation as it existed when this settlement was arrived at; and from this situation it seems to me that the conclusion is irresistible that the plaintiff cannot succeed in upsetting this agreement, which he knowingly and intelligently executed, and which settled the controversy that had existed between himself and his partner and released him from the firm obligations. The plaintiff was a lawyer, who had for many years been engaged in the active practice of his profession. He testified that he had charge of the firm books of account, the management of the real estate, the making of loans, and the financial affairs of the firm; and he does not claim that he had any lack of knowledge of the essential facts which had produced the situation in which these partners found themselves, and which led up to the execution of this agreement. He says that at the time he was suffering with overwork and not well, and his physician has testified as to his physical condition at the time; but there is not a suggestion that his mind was weakened or his power of forming a correct judgment impaired, and it was expressly stated by counsel on the trial that it was not claimed that plaintiff was incapable of understand-

ing or of attending to private business, or of knowing what he was doing. The question as to the condition of the firm first arose between the partners about the 8th or 9th of March, 1895, and from that time until the execution of this agreement, a period of almost three months, negotiations were conducted between the plaintiff and the defendant Ormiston as to a settlement of the differences between them. Claims were made by the members of the McCormack family against the firm, and the obligation of the firm to the Corn Exchange Bank had to be provided for. The latter part of April a Mr. McIntyre was called in, at first apparently as a mutual friend, to discuss the situation; and on April 30th a Mr. Lathrop, a prominent member of the bar, appeared as representing the plaintiff, his wife and sister. It is true that the plaintiff now claims that Mr. Lathrop did not represent him, but was retained to represent his wife and sister. Whatever may have been the original retainer, the record establishes beyond a doubt that Mr. Lathrop assumed to represent the plaintiff with his knowledge and consent, and was in constant communication with him during the negotiations. We have the plaintiff, himself a lawyer of many years' experience, who had for years conducted this business, which particularly required business capacity; a prominent member of the bar engaged with him in conducting negotiations on his behalf, and on behalf of his wife and sister, and constantly visiting him in relation to it; and opposed to them were the defendant Ormiston, one of the McCormack family, a young man just admitted to the bar, and Mr. McIntyre, who had no legal experience. The threats of arrest made by the McCormacks and Ormiston, and the statements made by Mr. McIntyre which impressed upon the plaintiff the danger of his position, were made, not to a person ignorant of his legal rights, who executed without legal advice an instrument to avoid what was considered to be a pressing danger, but to a lawyer of experience and ability, who, from all the evidence, certainly had knowledge of the facts and an opportunity of appreciating the situation, and who was advised by counsel selected by himself. It is possible that the plaintiff has made a bad bargain, but, if he wished to disaffirm it, he was bound to promptly make his election, and could not wait until the rights of others had been affected by it. It is unnecessary to express an opinion as to the conflict in the testimony of the plaintiff and the defendants as to the interviews that they had with each other. They are hopelessly at variance upon almost everything that happened from the time of the first dispute, early in March, until the time the agreement was finally executed. The trial judge heard them testify, and had a better opportunity than we have to judge as to the weight to be given to their testimony. The evidence does not so preponderate that we would be justified in reversing his finding upon any disputed question of fact. Mr. McIntyre, who conducted the negotiation on behalf of the defendants with Mr. Lathrop, who represented the plaintiff, testified that the substance of the agreement as finally entered into, and which was evidenced by an instrument dated May 29, 1895, was suggested by Mr. Lathrop; and this testimony shows that the whole situation was fully discussed between McIntyre and

Lathrop, and that the value of the assets belonging to the firm was discussed, and several estimates made of them by outside experts. His testimony, which is not disputed in any way, shows how the agreement finally executed was arrived at. In speaking of the valuation of the property belonging to the co-partnership, McIntyre testified:

"There was one set of values by Middlebrook, and one set by Ormiston & Dorsett. I saw this paper in Lathrop's office, and we discussed it. * * * Those valuations there show a firm credit, and we came to an agreement as to what values I should take for the final proposition. The lowest total valuations were those prepared by Dorsett, though in some cases as to totals my valuations were lower than his. Lathrop and I discussed what allowances should be made in those valuations,—that real estate of this kind was very hard to value, and some of it was very unsalable, particularly the apartment houses, and that a large reduction should be made on the estimate of the values given because of that fact, and that the lots, many of them, were rather unsalable locations, and would have to be carried some time, and we made allowances for them. In a general way. we figured an allowance of from twenty to twenty-five per cent. from the estimated values of the real estate. We made a classification of the mortgages which we considered good and bad and doubtful. We also had a discussion about the paper, Ex. 67, which contains figures prepared by Ormiston, about the first page of that exhibit, which shows according to certain valuations certain deficits, and according to certain other valuations certain other deficits. I stated that Middlebrook's values were high, and Dorsett's values too low, for the market valuations of these properties. We discussed these values in detail right straight through. Lathrop had other figures than those sent me by Ormiston. I do not know what became of them. He had various statements and lists of these properties, with valuations on them. We arrived at the conclusion that the probable result of the transfer of all these securities of the firm to Ormiston, and the assumption by him of all the liabilities, would be that by careful management they would probably pay out; that it might eat into some of Mrs. Ormiston's estate. I finally yielded my demand that Dorsett should pay money in addition to giving up these securities."

After this interview, which took place in the latter part of May, Lathrop said that a release from the bank would be necessary in the settlement, and asked McIntyre to see if it could be arranged. The witness saw Mr. Nash, the president of the bank, and made an arrangement for such a release, and the witness then testified that on the 29th day of May, the day that the agreement was finally reached, "we went over then the final details before we put anything in writing,—the conditions that he asked in regard to these releases which I have spoken of,—and then we came down to the securities that Dorsett should return to the firm. I had abandoned before this my claim that Dorsett should make a cash payment. The only point of discussion on May 29th, or thereabouts, was the exchange of their securities in order to make up the amount we had agreed upon. On that day Lathrop and I came to a final conclusion which was reduced to writing," prepared by Lathrop, and signed by Lathrop and McIntyre; and from that agreement, thus signed, there was afterwards prepared the formal instrument. These formal instruments were prepared by Ormiston, were delivered to McIntyre, and by him sent to Lathrop on May 30th; and were finally executed on June 1st. The death of Mr. Lathrop since those negotiations were finally completed has prevented us from having the benefit of his testimony; but the substantial accuracy of Mr. McIntyre's statement, which has just

been quoted, is not disputed, and it seems to me that it takes from under the plaintiff every ground upon which he could ask to have the agreement set aside. His real, substantial objection is that two years afterwards he came to the conclusion that he had made a mistake, and would be better off if he could get back all the property which he had conveyed, with the firm obligations settled and out of the way. There is no case with which I am familiar in which a court of equity has set aside an agreement formally prepared and executed under circumstances here detailed.

There are many exceptions to rulings upon evidence, but none of them requires notice. No competent evidence that could in any way help the plaintiff was excluded, and no error was committed that would justify the reversal of the judgment.

The plaintiff also appeals from the order granting an extra allowance to the defendants other than Ormiston. We think the nature of the action fully justified the action of the court in granting the allowance. The trial of the case took many days, involved an immense amount of preparation, and the case was certainly an extraordinary one.

My conclusion is that the appeal is without merit, and that the judgment and order appealed from should be affirmed, with costs. All concur.